UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


UNITED STATES OF AMERICA

VS.                         CRIMINAL NO. 3:16cr00076DPJ-LRA
                                   and 3:17cr00108DPJ-LRA

RODNEY NELSON




SENTENCING HEARING


BEFORE THE HONORABLE DANIEL P. JORDAN III
UNITED STATES DISTRICT JUDGE
JANUARY 3, 2018
JACKSON, MISSISSIPPI



APPEARANCES:

FOR THE GOVERNMENT:    MR. CHRIS WANSLEY

FOR THE DEFENDANT:     MR. MICHAEL L. KNAPP



REPORTED BY:  CHERIE GALLASPY BOND
              Registered Merit Reporter
              Mississippi CSR #1012

_____

501 E. Court Street, Ste. 2.500
Jackson, Mississippi  39201
(601) 608-4186

1          THE COURT:  All right.  Mr. Wansley, are you ready?

2          MR. WANSLEY:  Yes, Your Honor.  Before the court we

3    have the matter of *United States v. Rodney Nelson*, criminal

4    number 3:17CR108.  And we're here, Your Honor, for a sentencing

5    on two counts, Counts 4 of the indictment and the single count

6    of an information.  And Mr. Nelson is present with his counsel,

7    Michael Knapp.

8          THE COURT:  All right.  Thank you.  Mr. Knapp, are you

9    ready to proceed?

10          MR. KNAPP:  Yes, Your Honor.

11          THE COURT:  Y'all come on up.  All right.  Mr. Nelson,

12    did you have a chance to read the presentence report and the

13    addendum to that report?

14          THE DEFENDANT:  Yes, sir.

15          THE COURT:  Did you have a chance to go through those

16    documents with your attorney?

17          THE DEFENDANT:  Yes, sir.

18          THE COURT:  Did you have a chance to ask your attorney

19    any questions that you might have had about what's contained in

20    the presentence report and the addendum?

21          THE DEFENDANT:  Yes, sir.

22          THE COURT:  Was he able to answer your questions for

23    you?

24          THE DEFENDANT:  Yes, sir.

25          THE COURT:  Is there anything in either the

1  presence report or the addendum that you don't understand?

2      THE DEFENDANT:  No, sir.

3      THE COURT:  You understand both those documents?

4      THE DEFENDANT:  Yes, sir.

5      THE COURT:  Okay.  Mr. Knapp, will you agree that your

6  client does understand what's reflected in the presentence

7  report and the addendum?

8      MR. KNAPP:  Yes, Your Honor.  It went over both with

9  my client and asked -- answered all his questions.  The

10 confusion he may have is relating to the bundling guidelines,

11 which I talked to him about this morning.  And I'm not

12 certain --

13     THE COURT:  Okay.  Are you talking about grouping?

14     MR. KNAPP:  Yes, Your Honor.

15     THE COURT:  All right., Mr. Nelson, I guess you had a

16 question or two for your attorney about how these crimes are

17 grouped under the guidelines.  Is that right?

18     THE DEFENDANT:  Yes, sir.

19     THE COURT:  Okay.  I know it can be complicated, but

20 did he explain it to your satisfaction?

21     THE DEFENDANT:  Yes, sir.

22     THE COURT:  Okay.  Mr. Nelson, you can return to your

23 seat.  Mr. Knapp, I'll let you stay there for a minute.  I

24 received initially four objections to the presentence report,

25 and my understanding is that one of them has been, I think,

1    withdrawn but the three remaining are that the defendant

2    objects to the total weight of cocaine base or crack that's

3    reflected in the presentence report and used to calculate the

4    guidelines.

5             Second is that the defendant objects to the two-level

6    enhancement for the firearm.  And then the last objection is

7    that -- the two-level increase for being an organizer or a

8    leader.  There was an objection to the criminal history

9    category, but my understanding is that that was withdrawn.  Is

10   it those three that I mentioned?

11            MR. KNAPP:  That is correct.  The objections to the

12   original presentence report.  I do have an objection to the

13   addendum to the presentence report relating to the kidnapping

14   and murder charges.  And my objection, however, is based on the

15   fact that there's been no grand jury indictment and everything

16   else and the court shouldn't consider those.

17            THE COURT:  Okay.  The -- in terms of the guideline

18   calculations, though, these are the three objections we need to

19   address?

20            MR. KNAPP:  Correct.

21            THE COURT:  Okay.  All right.  Let's start with the

22   first one there.  And if you would, explain to me the

23   objection.

24            MR. KNAPP:  Yes, Your Honor.  If it please the court,

25   when this case started, Mr. Jerry Rushing was the U.S. Attorney

 1   involved, and there was a large amount of discovery presented

 2   to me, which I studied.  And discovery consisted of wiretap

 3   intercepts and documents.

 4          I did not have all of them so I went back to

 5   Mr. Rushing, and he gave me another thumb drive which was

 6   encrypted.  And to make a long story short, I went to

 7   Mr. Rushing and asked for him to tell me what the losses

 8   were -- what the drug quantities were.  I thought we were

 9   entitled to that, and I couldn't determine them from my

10   ability.

11          And Mr. Rushing provided me with a document, which I

12   no longer have -- I've got my computations based on the

13   document; but I don't have the document itself -- showing me

14   the relative drugs and amounts.  But Mr. Rushing and I did not

15   reach an agreement either in writing or orally.  In fact, he

16   told me these amounts were his computations and they are not

17   definitive.  So I don't want to claim any kind of agreement.

18          However, when we got the presentence report, the

19   guidelines -- the amount on crack cocaine was 265 grams as

20   opposed to 211 grams given to me by Mr. Rushing.  Your Honor,

21   that's essentially my argument.  There's no testimony except

22   for what I've notified the court.  You know, we just -- it's

23   hard to find these amounts when you're flooded with a ton of

24   discovery, and you're still not certain you've got it all.

25          And we did rely on it, but I cannot say it is the

1    basis of our plea.

2            THE COURT:  All right.  The presentence report itself

3    lists the amounts.  It does the equivalency calculations that

4    identifies where the -- where the amounts were determined, you

5    know, by different labs.  I think there's more than one lab

6    involved.

7            Is there anything incorrect or do you have any

8    evidence to show me that those facts in the presentence report

9    are incorrect or not somehow reliable?

10            MR. KNAPP:  No, Your Honor.  I have no dispute as to

11    the calculations by probation as reflected in the presentence

12    report, and I'm not alleging any error in the computations

13    thereof.  The sole grounds is the discrepancy of what I was

14    provided and what the presentence report said.

15            THE COURT:  Is there -- I'm not even sure what that

16    argument is, but is there any legal authority to support it?

17            MR. KNAPP:  No, Your Honor.  You'd be surprised I

18    wasn't able to find any.

19            THE COURT:  All right.  Mr. Wansley, anything from the

20    government?

21            MR. WANSLEY:  No, Your Honor, only that -- well, Your

22    Honor, only that the amounts for the crack cocaine were

23    supported by analysis from drug labs, and that information was

24    included in the PSI, Your Honor.

25            THE COURT:  Okay.  All right.  That objection's

1    overruled.  The -- even if there had been a stipulation

2    reached, as the parties know, I'm not bound by those

3    stipulations.  I still look at the facts.  Here Mr. Rushing, I

4    think, indicated that he was not saying that that was the

5    definitive amount, that's just what he was showing at the time.

6          Obviously I have to base the sentence on the facts,

7    and the facts reflected in the presentence report have not been

8    challenged in any way.  I think there's certainly an indicia of

9    reliability that applies to the presentence report in general

10   and specifically in the context of this case.  I think the drug

11   quantities were correctly calculated.  All right.

12         So the next question has to do with the gun

13   enhancement.

14         MR. KNAPP:  Yes, Your Honor.  This is the issue

15   where -- or the incident where the defendant was stopped and

16   his car had two firearms, a rifle and a pistol, and a tiny

17   bottle -- one-ounce bottle specifically that contained 15

18   milliliters of PCP.  The government from the beginning alleged

19   that he was selling the PCP.  We from the first said it was for

20   personal use.  And, in fact, we had a hearing based on a motion

21   to suppress the search based on those similar facts.

22         Your Honor, we believe that the government has the

23   burden of proof to show a connection between the crime, which

24   in this case was drug trafficking or drug sale, and the

25   defendant and the drug and the gun.

1          We do have some case law on that, Your Honor.  And

2     it -- the case law indicates that the government does have the

3     burden of proving there's a nexus between guns and the crime

4     charged, and I think the crime charged is sale of drugs.

5          THE COURT:  Wait.  That's a big distinction.

6          MR. KNAPP:  Excuse me, Your Honor.

7          THE COURT:  I want to stop there for a second.  You

8     say between the gun and the crime charged.  Is that what they

9     have the burden of proving, or do they have the burden of

10    proving some nexus between the gun and relevant conduct?

11         MR. KNAPP:  Your Honor, I believe it's the charge that

12    he's been charged with.  I have a couple of cases because even

13    though the guidelines indicate the possession of the guns is

14    enough, the case law indicates that there must be some kind of

15    connection.

16         THE COURT:  But the Fifth Circuit has said in *Vital,*

17    *King, Snelson*, and other cases that the link could be proven if

18    the gun was possessed close in time to related relevant

19    conduct.  They also said, I think, in *Vital* that the adjustment

20    is not limited to those scenarios in which the defendant

21    possesses a dangerous weapon during the offense of conviction.

22         I think the Fifth Circuit -- unless there's been a

23    change -- and I would invite you to give me some authority on

24    that -- the Fifth Circuit position has been it doesn't have to

25    be linked to the offense of conviction, but it has to be linked

```
 1    to relevant conduct.

 2            MR. KNAPP:  Your Honor, may I approach my counsel

 3    table?

 4            THE COURT:  Sure.

 5            MR. KNAPP:  Your Honor, I do not have a new case.  I'm

 6    relying to a large extent on a couple of cases.  One is United

 7    States v. Vasquez, 161 F.3d 909 (5th Cir.).

 8            THE COURT:  909?

 9            MR. KNAPP:  909.

10            THE COURT:  Okay.

11            MR. KNAPP:  Your Honor --

12            THE COURT:  What did they say?

13            MR. KNAPP:  Your Honor, they discuss it at length, and

14    I was under the impression it said between the crime charged

15    and the gun, and I've got it, if the court will allow me just a

16    moment.

17            THE COURT:  I think there's certainly cases where that

18    was the alleged nexus.  In other words, the defendant was

19    charged with the drugs that were found the day that the gun was

20    found, and the court said you have to have some sort of nexus

21    between the gun and the charged offense.

22            MR. KNAPP:  Yes, sir.

23            THE COURT:  But when the Fifth Circuit has looked more

24    specifically at cases where that was not the circumstance,

25    they've said it doesn't have to be connected to the offense of
```

1   conviction.  It has to be related to any relevant conduct.

2           MR. KNAPP:  I understand, Your Honor.  And I know this

3   isn't a new case, but it does cite other cases that said there

4   needs to be a sufficient nexus between a defendant's firearm

5   and the offense, and I interpreted that to be the offense for

6   which it was charged.

7           THE COURT:  Okay.  Let me ask it more specifically.

8   Do you have a case that says -- that actually arises under this

9   context that says a connection to relevant conduct is not

10  sufficient?

11          MR. KNAPP:  Perhaps I'm -- my shortcoming in years,

12  I'm not understanding what you mean by relevant conduct.  I

13  know what relevant conduct is, but specifically here.

14          THE COURT:  So, for example, in this presentence

15  report, it states that the defendant had been involved in an

16  ongoing drug trafficking operation.  So he's being held

17  responsible in the presentence report not just for the drugs

18  contained in Count 4, he's being held responsible for a series

19  of transactions.

20          And as I understand the cases I read last night, if a

21  gun is possessed in connection with that drug trafficking

22  activity, the other relevant conduct, it still counts even if

23  it's not connected to the specific offense -- in other words,

24  in this case even if it's not connected specifically to

25  Count 4.

1          MR. KNAPP:  I understand now, Your Honor.  And

2    relevant conduct I believe would be the connection.  But in

3    this case we're talking about -- I am personally isolating the

4    instance when he was stopped, had guns in the car, had PCP in

5    the car and I'm alleging it was for personal use.  I am -- I

6    believe that's separate from the ongoing criminal activities

7    reflected in the presentence report, the other instances where

8    he sold drugs and all that.

9          So I am isolating this case.  I think it -- this

10   segment stands on its own.  It has to be a connection between

11   the crime.  I don't see the connection between the other

12   charges and these guns.

13         THE COURT:  Okay.

14         MR. KNAPP:  I see possibilities.  I mean, I see, you

15   know -- but I don't see anything that would amount to being a

16   preponderance of the evidence standard that these were used or

17   going to be used in the relevant conduct that the court's

18   pointed at.

19         THE COURT:  I want to make sure I'm fair to you and

20   your client and tell you the things that are on my mind.

21         MR. KNAPP:  Yes, sir.

22         THE COURT:  Give you a chance to respond to them, but

23   the PCP that day, according to the presentence report, was

24   purchased from the defendant's regular source for PCP.  The

25   firearms involved, we're not talking about hunting rifles.

1    There's a semiautomatic.  Both the firearms had -- I'm not sure

2    I want to call them high capacity clips, but they had multiple

3    round clips that were loaded.  He had done all of his drug

4    transactions that I'm aware of in the PSR, he had conducted all

5    of them in vehicles, and here he is in a vehicle with PCP that

6    he bought from the same guy in the same type bottles he was

7    selling and he's got, you know, an assault rifle and a .45 in

8    the car with him.  All of that suggests that these guns were

9    there as tools of the trade.

10          MR. KNAPP:  I understand the court's position.

11          THE COURT:  It's not my position.  I'm telling you

12   that that's the concern I have, but I wanted to give you a

13   chance to respond to it.

14          MR. KNAPP:  Yes, sir.  Much of the discovery was

15   videoed on drug sales by my client.  There were no allegations,

16   and I didn't see any guns.  The reports I've seen didn't report

17   him carrying a firearm during these drug sales, and the only

18   place I've seen the drugs -- except for a 9 millimeter I think

19   he bought at a gun show -- but the ones in the car were I

20   believe a .45 and an AK-47.

21          There's been no showing those are used in any

22   capacity, and I'm certain if they -- someone had brought it to

23   the attention of the investigating officers or the people

24   holding -- the ease dropping and wiretapping video people, it

25   would have been mentioned.

1    I don't want to say I know a lot of people with AK-47s

2    in their car, but I do know some that are not drug dealers to

3    my knowledge.  And I don't think we could attach this to the

4    relevant conduct, the other charges he was indicted for but

5    didn't plead guilty to.

6         THE COURT:  Okay.  All right.  Let me hear from the

7    government.

8         MR. WANSLEY:  Your Honor, first in pulling up the case

9    cited by the defense, I'll read directly from it.  I'm sorry I

10   haven't had a chance to digest the entire case, but the court

11   had said in that case in that the application of 2D1.1(b)(1)

12   turns on the possession of the firearm and does not

13   specifically mention a connection to the offense.  And arguably

14   2D1.1(b)(1) requires less of a relationship.

15        Your Honor, we have an instance here or a matter where

16   this gun was possessed as part of the same course of conduct or

17   common scheme or plan or all of the transactions that the

18   defendant was alleged to have violated.  On November 6, 2014,

19   as stated in paragraph 33 through 35 of the PSI, the defendant

20   is being held responsible for the sale of 27 milliliters of

21   PCP.

22        Just a few months later, he's also found in possession

23   of 15 milliliters of PCP, and that's when the authorities

24   actually seized the .45 caliber handgun as well as the AK in

25   which he over wire intercept told somebody, *Hey, man, they got*

1  *my guns.*

2         Then after that point, Your Honor, there were two

3  other seizures of smaller amounts of PCP.  And during this

4  time, Your Honor, there was the purchase from UCs working on

5  behalf of the government of additional quantities of drugs,

6  including cocaine as well as crack and methamphetamine.

7         And because of these sales were occurring during a

8  broad time period, again, Your Honor, the government's point is

9  this is all part of a common scheme and plan, and part of that

10  plan we know that these weapons were possessed by the defendant

11  during that time period.  And so because of that, we believe

12  that they were appropriately calculated under 2D1.1, Your

13  Honor.

14         THE COURT:  All right.  Thank you.  Mr. Knapp?

15         MR. KNAPP:  Your Honor, I merely reiterate my previous

16  arguments, and I believe the court has my arguments based on

17  that, and I believe the court has connected the relevant

18  conduct.  I don't believe it was connected to relevant conduct,

19  and that's where we are, Your Honor.

20         THE COURT:  Okay.  All right.  Under 2d1.1(b)(1)

21  there's a two-level increase if a dangerous weapon, including a

22  firearm, "was possessed."  The application notes to that

23  section explain why this enhancement exists and that is because

24  the possession of a weapon reflects an increased danger of

25  violence when drug traffickers possess them.

1          The enhancement should apply if the government first

2     proved by a preponderance of the evidence that the defendant

3     possessed the firearm.  The government may do so by showing

4     that a temporal and spatial relation existed between the

5     weapon, the drug trafficking activity, and the defendant.  I'm

6     citing *Ruiz* for that, 621 F.3d at 396.  In *Vital*, 68 F.3d 114,

7     the court noted that the adjustment is not limited to those

8     scenarios in which the defendant possesses a dangerous weapon

9     during the offense of conviction.  Instead, a temporal link can

10    always be proven if the gun was possessed close in time to

11    related relevant conduct, meaning conduct that is within a

12    common scheme or plan of the offense of conviction.

13         The Fifth Circuit said the same thing in *King*, 773

14    F.3d 48, and Snelson 687 F.Appx. 422, which was decided last

15    year.

16         When counsel asked whether the gun is connected to

17    relevant conduct, it really can be looked at in two different

18    ways.  One is whether the PCP found in the car on

19    February 19th should be considered relevant conduct, but the

20    other way to look at it is whether the gun had a connection to

21    the other drug trafficking activities, in other words, the

22    other relevant conduct that was taking place during that time

23    period.

24         The facts as reflected in the presentence report

25    indicate the following.  That starting in -- at least at early

as September of 2014, the defendant was selling drugs,
including PCP, and that he would typically sell the drugs from
various cars that he possessed.

February 19, 2015, a wiretap indicated that the
defendant had a firearm and that he was going to purchase PCP
from a known source of supply.  He was seen conducting what
appeared to be a transaction.  He left, but then his source
"instructed" him to return.  He returned in the same car, and
it appears that another transaction occurred.

After that, he was stopped and a small amount of PCP
and other items were found.  The item -- other items in the car
would at least suggest the possibility that the PCP in the car
that day was -- or at that time could have been for personal
use.  But, again, the question is whether he possessed a
firearm in relation to his drug trafficking activities.  I find
that he did.

The guns that were found, first he had a .45 caliber
Springfield which was loaded with the magazine containing 13
rounds in his front seat.  The other weapon was a semiautomatic
rifle described as an AK-47, which was also loaded with ten
rounds found in the back seat.  There's no dispute that he
possessed these weapons.

These are clearly not hunting rifles but instead are
common tools of drug trafficking trade.  As I said, they were
found in the car and we know that the defendant conducted his

1  drug trafficking activities from cars.  Ammunition involved

2  also indicates or is indicative of drug trafficking as the

3  court addressed in *United States v. Rodriguez Guerrero*, 805

4  F.3d 192 (5th Cir. 2015).

5          I think it's also somewhat significant that the

6  defendant told someone over the phone that his firearms had

7  been taken and then within nine days he had replaced them with

8  a 9 millimeter Taurus.  And significantly all of this was

9  happening during a time when he was engaged in drug trafficking

10  activities involving cocaine, cocaine base, methamphetamine,

11  and PCP.

12          The other drug transactions are relevant conduct, and

13  they continued until his arrest.  I think the case is similar

14  to *United States v. Snelson*, where the defendant was arrested

15  for selling drugs.  He was released, and after he was released

16  he bought a firearm.  In other words, he purchased the firearm

17  after the offense of conviction, and he continued to sell drugs

18  after that.

19          The district court found that this continued

20  trafficking constituted relevant conduct and also determined

21  that a temporal and spatial relationship existed between the

22  firearm and drug trafficking activity and the defendant.  The

23  Fifth Circuit agreed, and it affirmed the guideline

24  calculation.

25          The relevant conduct here shows that we also have a

1  temporal and spatial relationship between these firearms and

2  the ongoing drug trafficking operation; that he possessed the

3  firearms as part of it; that the transactions occurred in the

4  cars, which is where the firearms were found; that when they

5  were taken, he replaced them and that these were not the types

6  of firearms and ammunition where you could argue that it was

7  clearly improbable that the weapon was connected with the

8  offense.

9         Finally, as to the more specific argument that the

10 defendant makes regarding the PCP on that day, there's at least

11 an alternative argument that the PCP was itself part of

12 relevant conduct.  As I noted, the defendant made two stops to

13 the source the day that the PCP was found.  Application note

14 5(B)(2) to Section 1B1.3 addresses relevant conduct that is

15 part of the same course of conduct.

16        As the PSR shows, there were repeated instances of

17 buying and selling PCP in the same type containers that were

18 found in his car on February 19, and the sale on this day was

19 from Nelson's source.  Possession was therefore similar to

20 repetitive offenses during -- before, during, and after this

21 stop on February 19th.  I find that it was sufficiently

22 connected or related to the other drug trafficking activity

23 such that it was part of an ongoing series of offenses.  So the

24 objection is overruled.

25        All right.  Mr. Knapp, the last objection relates to

1    the two-level enhancement under 3(b)1.1(c).

2           MR. KNAPP:  Yes, Your Honor.  Your Honor, the last

3    objection we have in the presentence report relates to whether

4    or not my client was a supervisor, leader within the meaning of

5    the guidelines, and we have alleged that he is not.

6           Your Honor, we rely on the presentence report.

7    Specifically there's a paragraph when Bennie Evans, I believe

8    it is, paragraph 35 of the presentence report, we believe that

9    the only evidence they have or at least have shown in the

10   presentence report is that Mr. Evans -- when one of the drug

11   deals that Mr. Evans was conducting with someone else, there

12   was dispute as to the amount of a drug, and Mr. Evans called

13   the defendant and it was settled that the lower end of the

14   dispute amount would control, specifically $1,900 lowered to

15   $1,600.

16          So Mr. Evans did rely on Mr. Nelson to settle that one

17   dispute.  But as stated by the court and as stated in the

18   presentence report, there are a lot of activities going on

19   where the defendant acted alone.  At least all the videos that

20   I watched he was alone, and I can't find out where Mr. Evans or

21   anyone else has been -- I'll say the defendant has been a

22   supervisor to anyone else.  Mr. Evans is mentioned other

23   places, but it's not in any serious context.  For example, one

24   time he was listed as in the car.

25          We don't believe that's enough -- that one item is

1  enough to support a organizer/leader enhancement as stated by

2  probation.

3       THE COURT:  All right.  Again let me ask you, do you

4  have any authority that says that one drug transaction is not

5  enough?

6       MR. KNAPP:  No, Your Honor.  I did try and look.  I

7  didn't see one.

8       THE COURT:  Okay.  Mr. Wansley?

9       MR. WANSLEY:  Your Honor, we believe that paragraph 35

10  of the PSI is fairly clear.  And in that, Mr. Nelson was a

11  manager or organizer, leader to justify the enhancement in the

12  PSI.  Obviously, based on the information that is in the PSI,

13  that Mr. Evans, it appears, was conducting the drug transaction

14  on behalf of Mr. Nelson.  When there was a discrepancy with the

15  price, Mr. Evans could not remedy that issue and the UC had to

16  speak personally with Mr. Nelson to actually get the lower

17  price.

18       And again, Your Honor, we defer to probation, but

19  believe that what is included in the PSI, specifically

20  paragraph 35, does support the enhancement.

21       THE COURT:  All right.  Any rebuttal?

22       MR. KNAPP:  Your Honor, just one item.  I'd like to

23  emphasize the amount of activity as stated in the presentence

24  report that does not have the defendant as any kind of

25  supervisory role, and most of the time he's been acting on his

1    own and that that one sale where he mediated between the price

2    is all that they -- the government has alleged, like I relied

3    on 35.

4            THE COURT:  Okay.

5            MR. KNAPP:  That's all, Your Honor.

6            THE COURT:  Okay.  Thank you.  Mr. Knapp, I appreciate

7    your exploring all avenues for your client.  I think I know why

8    you couldn't find a case that said that one transaction is not

9    enough.  Every circuit that I've found so far that's addressed

10   that issue says that one transaction is enough.  3B1.1(c) has

11   three subparts.

12           The first would be a four-level increase under subpart

13   (a) if the person is an organizer or leader of criminal

14   activity involving five or more participants or is otherwise

15   extensive.

16           Subpart (b) is a three-level increase, and we're

17   talking about a less extensive criminal activity.

18           But by the time you get down to subpart (c), it

19   applies if the defendant was an organizer, leader, manager, or

20   supervisor "in any criminal activity."  In other words, it no

21   longer has to be extensive which is to find in the application

22   notes.  It has to be any criminal activity.

23           And application note 2 says that to qualify for

24   adjustment, you have to be an organizer, leader, manager, or

25   supervisor of one or more participants.  So when you take all

1    of that together, there only need to be one participant that

2    you supervised or led, and there only needs to be "any criminal

3    activity."

4        The Fourth, Eighth and Eleventh Circuits have all

5    addressed this issue.  In *United States v. Brown*, 614 F.Appx

6    632, the Fourth Circuit in 2015 applied this enhancement when

7    there was only one participant in one drug transaction.

8        In *United States v. Garrison*, 168 F.3d 1089, which is

9    an Eighth Circuit case, the court held that the enhancement

10   applied even if the defendant supervised one participant and

11   managed or supervised even one transaction.

12       In *United States v. Zepeta*, 389 F.Appx. 907, which is

13   the Eleventh Circuit case, the court stated, Zepeta's argument

14   that he does not qualify for an aggravating role enhancement

15   because of his offense consisted of a one-time drug transaction

16   is meritless because Section 3B1.1 contains no requirement that

17   the underlying offense occur over an extended period of time."

18       Some of those cases I just listed involve facts that

19   are very similar to those reflected in the presentence report

20   and support the finding that Mr. Nelson was a leader or

21   supervisor over his codefendant, Bennie Evans.

22       Those facts are reflected in paragraph 35.  I won't go

23   through all of them, but I would note that it was more than the

24   undercover officer -- it was more than Evans calling Nelson

25   about the price.  The undercover officer initially had a

1    telephone conversation where Nelson arranged the sale and

2    negotiated the price.  When the undercover officer arrived,

3    Nelson's car was there, but Evans is the one who came out and

4    got in the officer's car, asked for more money than the agreed

5    upon price.

6         And I think it's significant that at that point Evans

7    said, according to the PSR, he was "just repeating what Nelson

8    had told him."  At that point there was a conversation with

9    Nelson and the price was dropped, all of which indicates

10   Nelson's control over the situation.  He set things up.  He

11   maintained control over the transaction.  He directed Evans as

12   to what to accept.  And all of that is sufficient to say that

13   the defendant was organizing, managing, leading and/or

14   supervising at least one other participant in criminal

15   activity.

16        Mr. Knapp, if you and your client would come back up.

17   Counsel, the base offense fence level based on these rulings I

18   believe is a 31.  His criminal history category is 6 for a

19   guideline range of 188 to 235 months.  Do the parties agree

20   with those calculations, Mr. Wansley?

21        MR. WANSLEY:  Yes, Your Honor.

22        THE COURT:  Okay.  Mr. Knapp, based on the court's

23   rulings, do you agree on those calculations?

24        MR. KNAPP:  Based on the court's ruling, yes, sir.

25        THE COURT:  The court adopts the presentence report in

1    its entirety as the court's findings of fact.  Mr. Nelson, you

2    at this time have the right to tell me anything that you think

3    I need to know before I impose a sentence, and you can speak

4    for yourself or through Mr. Knapp or you both can speak.  It's

5    up to you, but this is your opportunity to exercise that right.

6              THE DEFENDANT:  Well, Your Honor, like my attorney

7    said -- well, like you said, I did set the deal up with

8    Mr. Evans and the agent.  But according to the paperwork and

9    the facts, I didn't -- if I was selling drugs I didn't need

10   Mr. Evans to do anything for me.  Everything he did was --

11   belonged to him.  I just -- the agent about the drugs.  I told

12   him I knew somebody that had it and that was it.

13             I didn't need Mr. Evans to do anything for me, and

14   that clearly shows that.  And any the paperwork, I didn't need

15   him.  As my attorney said, I acted alone when I did my crime of

16   selling drugs.  I didn't need anyone else.

17             As far as the PCP they found on me, the 15

18   milliliters, that was for personal use even.  I don't know if

19   he's an agent or what, but the guy who pulled me over, he

20   clearly stated sitting right there that he should have been on

21   record with saying I was a known user of PCP.  So it wasn't for

22   sale.  And as far as the other drug transactions, I never had a

23   gun with me.  The agent can't say that.  It says it nowhere in

24   the paperwork that I had a gun during those transactions.  So

25   it -- I'm just saying I really don't understand why I'm getting

1  charged with that, something I didn't do.  I take

2  responsibility for what I did.  But something I didn't do, I

3  just don't understand.

4          THE COURT:  All right.  Anything else?

5          THE DEFENDANT:  No, sir.

6          THE COURT:  Mr. Knapp?

7          MR. KNAPP:  Your Honor, the court is well aware of the

8  case, the facts, and the presentence report and is very much

9  aware that the sentencing guidelines are high -- I mean, not

10  too high, but he's got a lot of exposure to the guidelines.

11          We would ask the court to consider the fact that he is

12  a category 6 by one point, 13 and above, and his criminal

13  history point is a 13.  And he's got a criminal history.  But

14  the previous criminal history that I was able to determine

15  centered around mostly possession of drugs, not possession with

16  intent to manufacture, and possession a firearm by a convicted

17  felon, which he is pleading guilty here today.

18          We don't try to minimize the activity the defendant

19  has done.  We'd like the court to give some consideration of a

20  downward departure based on the fact that the guidelines are so

21  stringent in this case.

22          THE COURT:  All right.  Let me hear from the

23  government.

24          MR. WANSLEY:  The government supports the findings of

25  the presentence report and stands by its recommendation in the

1    plea agreement and the plea sup, Your Honor, and really doesn't

2    have anything further to add.

3         THE COURT:  Mr. Knapp, this probably is a better time

4    for you to make your argument about the arrest for -- or the

5    issues involving the suspected murder.

6         MR. KNAPP:  Yes, sir.  On the addendum or the second

7    report, they have added the -- probation has added documents --

8    I mean, well documents but more oral statements that indicate

9    that the defendant is suspected in crimes of kidnapping and

10   later in the crime of murder.

11        And as I read the addition, which is on paragraph 88,

12   I believe it is, these have not even been presented to a grand

13   jury.  And I can understand the court can consider any

14   activities of my client, but these are serious crimes.  And if

15   they have not been presented to a grand jury, there's not even

16   a probable cause determination, to my knowledge.  I have not

17   pulled the file in these cases.  No file to pull, I would

18   guess.

19        But I don't think the court should -- it does not

20   affect the guidelines, I would not think.  But I don't think

21   the court should consider the charges without any kind of

22   adjudication of probable cause in its determination on what to

23   sentence my client.

24        THE COURT:  All right.  Anything, Mr. Wansley, from

25   you?

1           MR. WANSLEY:  No, Your Honor.

2           THE COURT:  I'm going to take a short recess, put my

3      notes together because I have a question for probation.  We'll

4      stand in recess for ten minutes.

5           (Recess)

6           THE COURT:  Let me mention what caught my eye and what

7      I wanted to look into.  As I understand it from the presentence

8      report, the defendant was convicted in 2014 in Madison County

9      and was given ten years to serve, and then the following

10     year -- and that was a possession of a firearm case.  And the

11     following year he was convicted in Hinds County where he was

12     given ten years to serve on a possession charge to run

13     consecutive to a sentence in Madison County.

14          So unless there's something I'm missing, he's

15     currently facing back-to-back ten-year sentenced in state

16     custody.  And the question -- and I'll start with Mr. Wansley,

17     but the question in my mind is:  Under those circumstances and

18     Section 5G1.3(d), I think, I have some options there about

19     whether this sentence should run concurrently, consecutively,

20     or partially concurrent with those two state court convictions.

21          And what's always tricky to me -- and this is what I

22     wanted to pause and think about is I never really know how much

23     time somebody's going to serve in state court.  He could be out

24     in a few years, or -- I think it is unlikely he would serve the

25     20, but I just don't know.

1          What I'm -- so I'm going to tell you what I'm

2     contemplating is following the application note that allows me

3     to commence this sentence at a specific date in the future.

4     And if he's still in custody at that point, then from that

5     point on it would be running partially concurrent.  In other

6     words, let's say I say the sentence is going to begin ten years

7     from today or the day he's released from state custody,

8     whichever is earlier.  If he's released before the ten years,

9     then it's consecutive sentences.  If he's still in state

10    custody ten years from now, at that point it would be

11    concurrent until he's released from state custody.  That's what

12    I'm thinking about doing.

13          MR. WANSLEY:  Your Honor, the government has no

14    objection to that.  We would -- and especially in light of the

15    court already stating on the record it's obvious that no one

16    can predict when the state sentence will end.  We would just

17    highlight for the court the lengthy criminal history and just

18    ask the court to take that into consideration when choosing a

19    start date for the sentence.

20          THE COURT:  Okay.  Thank you.  Mr. Knapp?

21          MR. KNAPP:  Could I ask my client a question?

22          THE COURT:  Of course.

23      (Short Pause)

24          MR. KNAPP:  Your Honor, I was trying to confirm what

25    my client told me earlier, and it's somewhat a confusion to me.

1  My client indicates that they were concurrent sentences that

2  Judge Kidd in state court ran his ten-year sentence concurrent

3  with the Madison County sentence, and he said that the release

4  date was very close to the same time and very much -- it's very

5  close to his release date.

6          I do not have any information on that issue.  I was

7  going to ask the court to run this sentence concurrent with the

8  state court, but I did want to give the court the information I

9  have.

10         THE COURT:  Mr. Nelson, when did you think your

11  release date was from state?

12         THE DEFENDANT:  September 6th, 2017.  This was my

13  parole date on my time sheet I gave in the state because of my

14  parole date.

15         THE COURT:  Okay.  All right.  Let me just say on this

16  issue, and then I'll get into my ruling on the sentence, but

17  the only information I have right now other than what

18  Mr. Nelson just told us is the presentence report which

19  indicates that he was given ten years in Madison and ten years

20  consecutive in Hinds County.

21         It would -- if he actually served those 20 years, it

22  would not be my intent that he serve my sentence consecutive to

23  that because then you would be getting close to 40 years in

24  prison.  And given all the circumstance, I think that that

25  would be greater than necessary to accomplish the goals of the

1   sentencing statute.  If he's not going to serve much time in

2   state, then it would be my intent based on everything I'll say

3   in just a minute that the sentences run consecutive.

4          So I am going to follow application note 4(b) to 5G1.3

5   to make sure that he doesn't serve more time than I think he

6   should but that he does serve enough time to satisfy the goals

7   of the statute.  Of course, that statute is 18 USC

8   Section 3553(a), and it's always my responsibility and

9   obligation to impose a sentence that's sufficient but not

10  greater than necessary to accomplish the goals of that statute.

11         The guidelines are obviously advisory only.  I

12  consider the guidelines, and I also consider any agreements or

13  recommendations from the parties.  The recommendation I have in

14  this case is a sentence within the lower 25 percent of the

15  applicable guideline range.

16         Mr. Wansley, I know that you -- this case was thrown

17  at you today, I understand, and that happens when somebody

18  retires.  But Mr. Rushing did have a recommendation with

19  respect to the information on the gun charge where he was

20  recommending consecutive -- a consecutive sentence.  I'm not

21  going to do that because -- and I don't know that Mr. Rushing

22  looked at it this way, but under the guideline calculations,

23  these two offenses are grouped, and so the gun offense, as we

24  know, ended up being an enhancement as to the drug offense.

25  And because they area grouped, you don't really have a separate

1  sentence in the two separate cases.  They're grouped together.

2  There's one guideline range of 188 to whatever it was on the

3  top end months.

4         I'm going to impose a sentence that's within the

5  government's recommendation of the lower 25 percent but at the

6  top of that recommendation of the applicable guideline range.

7  First thing I have to look at is the nature and circumstances

8  of the offense and the history and characteristics of the

9  defendant.  Given this -- at this level of the guidelines, I'm

10  required to, Mr. Nelson, specifically explain why I am entering

11  this specific sentence I am.

12         That sentence is 200 months for these reasons.  With

13  respect to the offense, there's obviously a drug trafficking

14  operation going on involving a variety of drugs:  Crack,

15  cocaine, methamphetamines, PCP.  There's also the offense

16  related to the firearms.

17         As I look at the history and characteristics of the

18  defendant, Mr. Knapp, I agree there are offenses in there that

19  would fall under the category of possession, but there are

20  other offenses suggesting a history of violence, including six

21  convictions for assaults.

22         I would also note when you said that his criminal

23  history score was a 13 making him just one point within the

24  criminal history category of 6, which as we know is the highest

25  possible criminal category in the federal system, he also

had -- he's actually had 17 convictions, only six of which were counted for the guideline purposes.

I think if he had been in the lower, there would have been at least an argument that that does not accurately reflect the risk of recidivism in this case or the seriousness of the defendant's criminal history. I don't have to look at that because he topped out at 6, but I have to note that the vast majority of his convictions weren't even counted.

There are also 14 more arrests. I am aware of the allegations that he murdered someone that -- but that that case has not been taken to the grand jury, and I don't know if that's because the case is weak or because they know that he has two sentences in state custody already in addition to this.

I'm not going to -- I'm not going to consider that information in this sentencing. I think that the 200 months is appropriate without it. If I did consider it, then obviously the sentence would have to be much higher. So I'm not considering that just essentially for lack of sufficient reliable information.

I don't know who the witness was. I don't know how reliable that witness was. I just don't know enough about it to impact his sentencing in this case.

I do know that he has a history of drug abuse, including inpatient treatment that did not stick. There's a history of, as I said, violence and possession of firearms.

1          The sentence has to reflect the seriousness of the

2     offense, promote respect for the law and provide a just

3     punishment for the offense.  I don't think that a sentence any

4     lower than the one I'm imposing would accomplish any of those

5     goals.

6          This is a serious offense.  There has been a lack of

7     respect for the law, and there is a need for just punishment.

8          I also have to make sure that I've afforded adequate

9     deterrence to criminal conduct.  In this case, the defendant

10    really since the age of 18 has basically had one conviction

11    after another, and none of the sentences he's received to date

12    has stopped his criminal conduct.

13          In this case, I would note that when he was stopped on

14    February 19th and found to have two firearms illegally in his

15    possession, it was only nine days later that he went out and

16    bought another one.  So there is a need to promote deterrence

17    in this case.  And based on the criminal history that I see,

18    the firearms issues, nature of this offense, the pattern of

19    recidivism, there is a serious need in this case to protect the

20    public from further crimes of the defendant.

21          I'm also looking at one of the considerations and that

22    is whether or not the sentence creates any unwarranted

23    sentencing disparities.  There are a couple of related cases

24    here.  There are a large number of defendants.  Most of them

25    have not been sentenced at this point.  Unless I'm mistaken, I

1  think -- and, Mr. Knapp, you can tell me if I'm wrong, but I

2  think the only two that have been are Anderson and Martin.  Are

3  you aware of any others?

4          MR. KNAPP:  I'm not aware of any others, Your Honor.

5          THE COURT:  Anderson had a much less significant

6  criminal history and a lower offense level.  He received a

7  sentence within the lower portion of the guidelines.

8          Martin's criminal history was about as bad as the one

9  I have here, but his offense level is lower, and he too

10 received a guideline sentence.

11         This case, as I mentioned, is a guideline sentence.

12 And so the fact that the two other known coconspirators who

13 have been sentenced also received guideline sentences tell me

14 that this is not going to create any disparities in this case.

15 I've considered all the sentencing factors and obviously the

16 guideline computations, but the issues I've mentioned are the

17 ones that I think are most relevant in this case.

18         It's therefore the judgment of the court that the

19 defendant, Rodney Nelson, serve a term of 120 months

20 imprisonment as to the single count bill of information in

21 docket number 3:17CR108DPJ-LRA-001 to run concurrently to the

22 imprisonment term imposed in docket number 3:16CR76DPJ-LRA-00

23 for which he will serve a term of 200 months imprisonment for a

24 total term of 200 months to serve in the custody of the U.S.

25 Bureau of Prisons.

1      That sentence shall commence on the earlier of, one,

2  when the defendant is released from state custody in cases

3  2015-0-121 and 15-0-412, or on January 3rd, 2028.

4      The court is furthered imposing a partial fine of

5  $1,500 in each case for a total of $3,000 which is payable

6  immediately and during the term of incarceration.

7      The imprisonment shall be immediately followed by a

8  three-year term of supervised release in docket number

9  3:17CR108 and a four-year term as to Count 4 in docket number

10  3:16CR76 to run concurrently to each other subject to the

11  standard and mandatory conditions as listed on the judgment

12  order in addition to the following special conditions:

13      First, you shall not incur new credit charges or open

14  additional lines of credit without the approval of the

15  probation officer until such time as the fine is paid in full.

16      Second, you shall provide the probation office with

17  access to any requested financial information.

18      Third, you shall submit your person, property, house,

19  residence, vehicle, papers or office to a search conducted by a

20  United States probation officer.  Failure to submit to a search

21  may be grounds for revocation of release.  You shall warn any

22  other occupants that the premises may be subject to searches

23  pursuant to this condition.

24      An officer may conduct a search pursuant to this

25  condition only when reasonable suspicion exists that you have

1    violated a condition of supervision and that the areas to be

2    searched contain evidence of this violation.  Any search must

3    be conducted at a reasonable time and in a reasonable manner.

4    This provision is imposed due to the history of contraband,

5    including firearms.

6         Fourth, you shall participate in a program of testing

7    and/or treatment for alcohol or drug abuse as directed by the

8    probation officer.  If enrolled in an alcohol or drug treatment

9    program, you shall abstain from consuming alcoholic beverage

10   during treatment and shall continue abstaining for the

11   remaining period of supervision.  You shall contribute to the

12   cost of treatment in accordance to the probation officer copay

13   policy.

14        Five, you shall not possess, ingestion, or otherwise

15   use a synthetic cannabinoid or other synthetic narcotic unless

16   prescribed by a licensed medical practitioner.

17        Those last two provisions are obviously based on the

18   defendant's history of drug abuse.

19        Six, you shall participate in a mental health

20   aftercare treatment program to include anger management

21   counseling at the direction of the supervising U.S. Probation

22   Officer.  If enrolled in a mental health aftercare treatment

23   program, you shall abstain from consuming alcoholic beverages

24   during treatment and shall continue abstaining for the

25   remaining period of supervision.  You shall contribute to the

1    cost of treatment in accordance with the probation office copay

2    policy.

3         Should a balance remain on the fine following your

4    release from incarceration, it shall be paid in monthly

5    installments of no less than $50 beginning six days after you

6    are released from imprisonment.  If the fine is not paid in

7    full prior to the termination of supervised release, you are

8    ordered to enter into a written agreement with the financial

9    litigation unit of the U.S. attorney's office for payment of

10   remaining balance.

11        Further, the value of any future discovered assets may

12   be applied to offset the balance of criminal monetary

13   penalties.  You may be included in the treasury offset program

14   allowing qualified federal benefits to be applied to offset the

15   balance of criminal monetary penalties.

16        The defendant further is ordered to pay the mandatory

17   special assessment fee of $100 per count for a total of $200 in

18   this case.

19        Mr. Knapp, are there any requests about where the

20   defendant wishes to serve his term?

21        MR. KNAPP:  Your Honor, he has asked for Yazoo City if

22   he's qualified.

23        THE COURT:  Okay.  I'll recommend that the defendant

24   serve his federal term of incarceration in Yazoo City or the

25   nearest facility to Mississippi for which he's eligible.  I'm

1   also going to -- well, I'm sorry.  Do you have any other

2   requests?

3            MR. KNAPP:  Yes, sir.  My client has asked for a copy

4   of the presentence report.  I have before now refused without

5   authorization.

6            THE COURT:  I'm going to deny that request.

7            MR. KNAPP:  Yes, sir.

8            THE COURT:  Anything else?

9            MR. KNAPP:  I have a statement when the court's

10  through.

11           THE COURT:  Okay.  All right.  In that case,

12  Mr. Nelson, you entered a couple of pleas here in which you

13  waived or gave up some rights to appeal.  To the extent that

14  there are any issues that can be appealed, they have to be

15  appealed in a timely manner, which is generally 14 days from

16  the entry of judgment.  If you cannot afford to file an appeal

17  or hire an attorney, you can petition the court to appeal in

18  forma pauperis.

19           All right.  Mr. Knapp, you had something else?

20           MR. KNAPP:  Your Honor, if it please the court, based

21  on instructions from the federal public defender's office and

22  my research personally, I object to the reasonableness of the

23  sentence, specifically objecting to the gun enhancement and the

24  supervisory role as I've previously argued and the court has

25  ruled.

1      THE COURT:  Okay.  I understand.  Let me just say for

2  the record there, I don't think -- based on the presentence

3  report, I don't think either are necessarily close.  But to the

4  extent the either of them were in error, based on the history

5  and characteristics I have here, the nature of the offense, the

6  need to protect the public, I would be -- this would have been

7  the sentence.  200 months would have been the sentence whether

8  or not I had ruled in favor of the defendant on those

9  objections.

10      I think that they are ruled on correctly, but at the

11  end of the day, I don't think they make a difference.

12      Anything else from the government?

13      MR. WANSLEY:  No Your Honor.

14      THE COURT:  Mr. Knapp, anything else?

15      MR. KNAPP:  Nothing from the defense.

16      THE COURT:  All right.  We're adjourned.  Thank you.

17      MR. WANSLEY:  The government moves to dismiss the

18  remaining counts, and I will be submitting an order to the

19  court regarding same.

20      MR. KNAPP:  No objection.

21      THE COURT:  All right.

22   (Hearing Concluded)

23

24

25

1                          CERTIFICATE OF REPORTER

2

3          I, CHERIE GALLASPY BOND, Official Court Reporter, United

4    States District Court, Southern District of Mississippi, do

5    hereby certify that the above and foregoing pages contain a

6    full, true and correct transcript of the proceedings had in the

7    aforenamed case at the time and place indicated, which

8    proceedings were recorded by me to the best of my skill and

9    ability.

10         I certify that the transcript fees and format comply

11   with those prescribed by the Court and Judicial Conference of

12   the United States.

13

14         This the 20th day of February, 2018.

15

16                         s/ *Cherie G. Bond*
                           Cherie G. Bond
17                         Court Reporter

18

19

20

21

22

23

24

25